OPINION
{¶ 1} Defendant-appellant Michael Caldwell appeals his conviction and sentence from the Stark County Court of Common Pleas on one count each of breaking and entering and theft. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On December 30, 2002, the Stark County Grand Jury indicted appellant on one count of breaking and entering in violation of R.C. 2911.13(A), a felony of the fifth degree, and one count of theft in violation of R.C. 2913.02(A)(1), also a felony of the fifth degree. At his arraignment on January 3, 2003, appellant entered a plea of not guilty to the charges contained in the indictment.
 {¶ 3} Thereafter, a jury trial commenced on January 30, 2003. The following testimony was adduced at trial.
 {¶ 4} At approximately 1:00 a.m. on November 20, 2002, Walter Sternoss, a stocker at Wal-Mart on The Strip in Jackson Township, observed an individual walking around inside the store, which was closed. The man, who was in the hardware department, told Sternoss that he was looking for a propane torch since one of the pipes at his house had broken. After telling the man that the store was closed, Sternoss escorted the man out of the store.
 {¶ 5} The same evening, Terry Johnson, who was working the night shift for Davidson Property Services, was sweeping the parking lot of the Wal-Mart store with a street sweeper. Johnson had been sweeping the Wal-Mart parking lot nightly for seven months. When Johnson went around the back of the building to clean up at approximately 2:00 a.m., he observed a mid-to-late 1980's Ford pickup truck with a lawn mower trailer attached sitting next to the lawn and garden center. According to Johnson, "[t]here is never nothing there at that time of night." Transcript at 140. Johnson, who noted that the hood of the truck was up and who had not noticed the truck when he first arrived at around 1:40 a.m., testified that there was "various merchandise" on the back of the trailer, including approximately a half a dozen bikes and other items. Transcript at 144. Johnson then called the Jackson Township Police Department "to tell them that there was something going on." Transcript at 144.
 {¶ 6} When Johnson drove his sweeper by the truck a second time a few minutes later, he saw a black male wearing a brown skull cap and a brown coat. After the man looked up at him, Johnson went and called the police again. According to Johnson, after strapping down the merchandise, the man then slammed down the hood of the truck, backed the truck up, and left via the rear entrance and headed towards Portage Street. When the police arrived on the scene, Johnson told them which way the man had headed.
 {¶ 7} At trial, Officer Charles William Redleski of the Jackson Township Police Department testified that he was sent to the Wal-Mart on The Strip in Jackson Township at approximately 2:00 a.m. in response to Johnson's telephone calls. While traveling southbound on I-77 in an attempt to locate the pickup truck and trailer, the Officer located the truck and trailer near the Fulton Road exit. After the truck pulled over, even though the Officer had not activated any emergency lights to effectuate a stop, the Officer approached the driver of the truck and "advised him that we had had a report of bicycles being loaded on the trailer, asked him for a driver's license." Transcript at 177. The driver, who did not have a driver's license on him, told the Officer that his name was Calvin Caldwell[1] and gave the Officer his social security number and date of birth. However, when such information was run through the LEADS computer system, it was discovered that Calvin Caldwell was presently incarcerated in the Marion Correctional Facility. The Officer then determined that the driver's real name was Michael Anthony Caldwell. At trial, the Officer identified appellant as the person who was operating the truck and trailer and who had given him the name Calvin Caldwell.
 {¶ 8} Officer Redleski testified that, during an inventory search of the truck and trailer after appellant's arrest, he discovered six bicycles secured with bungie straps, bolt cutters in a toolbox, two gas grills, a charcoal smoker, two outdoor smoker grills, a garden lawn set, lawnmower and a wheelbarrow.
 {¶ 9} At trial, appellant testified in his own defense. Appellant testified that on November 20, 2002, he received a call from Brian Jones of Kitty Hawk Trucking in Crestline, Ohio, who appellant claimed he did occasional hauling for, instructing appellant to pick up a trailer from Wal-Mart in Jackson Township and take it to the Wal-Mart in Massillon, Ohio. Appellant testified that he spoke to Walter Sternoss and told him that his truck, which appellant claimed to have borrowed from a friend, was stalled. Appellant testified that he spoke with Sternoss for approximately 15 to 20 minutes inside the store and that, during their conversation, appellant told Sternoss that he needed a propane torch to fix the gears on his truck "because they are stalled and take this trailer down to the Canton — Massillon Wal-Mart." Transcript at 194. Appellant testified that he did not load any of the items onto the trailer or into the truck, but rather testified that the trailer was already loaded. Appellant, when asked, denied that there was anything odd about the situation, noting that he previously had picked up a trailer at a Wal-Mart in Marion, Ohio, for Brian Jones and dropped the trailer off at a Wal-Mart in Findlay, Ohio.
 {¶ 10} During his testimony, appellant testified that he did not give the Officer a wrong name to hide any crime, but rather because he did not have a valid driver's license. Appellant also denied that the bolt cutters found inside the truck were his.
 {¶ 11} On cross-examination, appellant admitted that he was convicted in 1985 for aggravated trafficking in drugs, in 1991 for two counts of aggravated trafficking in drugs, in 2001 for unauthorized use of a motor vehicle, and in 2002 for trafficking in drugs. Appellant was released from prison in September of 2002 for the 2002 trafficking in drugs charge. The following testimony was adduced when appellant was asked how the items, which appellant had testified were already loaded onto the trailer, ended up in the bed of his truck:
 {¶ 12} "The items were stacked so high, I took some off the trailer and put them in the bed of the truck so that everything was okay. But I took the bungies and strapped them down, strapped what was left down. That's why I had the bungies there." Transcript at 208.
 {¶ 13} Charles Newsom, Jr., an assistant manager with Wal-Mart who was employed at the store in The Strip at the time in question, testified that the store closed at 11:00 p.m. According to Newsom, after receiving a telephone call from the Jackson Police about a reported theft of items from the lawn and garden area of the parking lot, Newson spoke with Terry Johnson, the street sweeper, and then walked towards the lawn and garden area. Upon arriving at such area, Newson discovered that a small walk-through gate, which was normally chained shut, swung open freely. Upon examination, Newson noted that a link in the chain was lying on the ground and that the chain appeared to have been cut. According to Newsom, approximately eight to ten tarps that protected merchandise from the elements appeared to have been flipped up.
 {¶ 14} About an hour and a half later, the Jackson Township Police Department brought a truck in with the attached trailer. Newsom then had the items carried into the store and scanned them to obtain their value. A total of seventeen items were recovered, including a wheelbarrow, five bicycles, six outdoor fireplaces, a smoker grill, a three seat swing and other merchandise. Newsom testified that the total value of the items was $1,637.21.
 {¶ 15} Newsom also testified that most of Wal-Mart's truck freight arrives on 18-wheeled semis between 4:00 p.m. and 8:00 p.m., but that occasionally pet food deliveries occur either just before or just after closing time. Newsom further testified that while Wal-Mart receives deliveries from UPS, RPS and Yellow Freight, such deliveries never occur at night. According to Newsom, it would be "highly unlikely" for a transfer of merchandise from one Wal-Mart store to another to occur late at night and that, during the seven years that he had been at Wal-Mart, such a transfer had never taken place after closing hours. Transcript at 167. The following testimony was adduced when Newsom was asked how store-to-store transfers take place:
 {¶ 16} "A. There is a process, we refer to it as MTR. I believe it stands for merchandise transfer request. And it's, first there is paperwork generated, computerized paperwork generated from the store that's shipping the merchandise out. And that paperwork then accompanies the merchandise to the other store that's receiving it. And then they sign for receipt of it on that paperwork. Um, the merchandise is typically driven there. If it's a small item or something, it's shipped there by an associate and, typically in the associate's vehicle. If it's transfer in larger quantities, the sending store will typically rent a Ryder truck or U-Haul truck, that type of truck, and use it to transport the merchandise." Transcript at 168-169. According to Newsom, he has never seen merchandise placed on a truck or trailer and left unsecured outside the Wal-Mart store for pick up and transfer to another store.
 {¶ 17} At the conclusion of the evidence and the end of deliberations, the jury, on January 30, 2003, found appellant guilty of theft and breaking and entering. As memorialized in an entry filed on February 18, 2003, the trial court sentenced appellant to a determinate twelve month prison sentence on each count, to be served consecutively. Thus, appellant received an aggregate prison sentence of twenty-four months.
 {¶ 18} It is from his conviction and sentence that appellant now appeals, raising the following assignment of error:
 {¶ 19} "The jury verdict is against the manifest weight and sufficiency of the evidence thereby violating the due process clause of the fourteenth amendment of the United States Constitution and Article I, Section 10 of the Constitution of the State of Ohio."
 {¶ 20} Appellant, in his sole assignment of error, argues that his convictions for breaking and entering and theft were against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 21} In State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, 678 N.E.2d 541, the Ohio Supreme Court explained the difference between sufficiency of the evidence and manifest weight. Sufficiency of the evidence refers to the legal standard the trial court applies in determining whether the State has presented sufficient evidence on each element of the crime charged to submit the matter to the jury. The court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. Sufficiency of the evidence is evidence which, if believed would convince the average mind. Thompkins at 386, citations deleted. Once a trial court has determined that the evidence is sufficient, it submits the matter to the jury, which acts as the trier of fact.
 {¶ 22} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. . . . The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra. at 387, citingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 23} As is stated above, appellant was convicted of breaking and entering in violation of R.C. 2911.13(A) and theft in violation of R.C. 2913.02(A)(1). R.C. 2911.13 states, in relevant part, as follows: "(A) No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense as defined in section2913.01 of the Revised Code, or any felony." In turn, R.C.2913.02 states, in pertinent part, as follows: "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 24} "(1) Without the consent of the owner or person authorized to give consent."
 {¶ 25} "(B) . . . If the value of the property° stolen is five hundred dollars or more and is less than five thousand dollars . . . a violation of this section is theft, a felony of the fifth degree."
 {¶ 26} Upon our review of the record, we find that, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that appellant, by force, stealth or deception, trespassed in an unoccupied structure with the purpose of committing a theft offense and that appellant knowingly obtained or exerted control over another's property, without consent, and that the value of the property was five hundred dollars or more but less than five thousand dollars. As is stated in detail in the statement of facts, sufficient testimony was adduced that appellant broke into Wal-Mart's secured storage area by cutting a chain and then went into Wal-Mart's lawn and garden area and took merchandise valued at $1,637.21. Appellant, when he stopped for the police in the middle of the night, was discovered driving a truck and trailer containing the missing Wal-Mart merchandise. While appellant testified that he was hired to transfer the merchandise from the store in The Strip to another Wal-Mart store, testimony was adduced at trial that merchandise is never transferred from one Wal-Mart store to another in such a manner. As noted by appellee, [a]ppellant's acts did not meet the transfer procedures in any respect." In short, we find that appellant's convictions for breaking and entering and theft were not against the sufficiency of the evidence.
 {¶ 27} Furthermore, we find that appellant's convictions were not against the manifest weight of the evidence. Although, as is stated above, appellant testified that he was hired to transfer the merchandise to another store, the jury, as trier of fact, was is in the best position to observe appellant's demeanor and to weigh his credibility . Clearly the jury found appellant, who has a prior felony record, who admitted giving the Officer a wrong name, and whose testimony contradicted that given by Walter Sternoss,[2] lacked credibility.
 {¶ 28} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 29} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J., Hoffman, P.J. and Boggins, J. concur.
[1] Calvin Caldwell is appellant's brother.
[2] While Sternoss testified at trial that appellant asked for a propane torch to fix a frozen pipe, appellant testified that he had asked for the same to fix frozen gears on his truck.